1  HARMEET K. DHILLON (SBN: 207873)
   harmeet@dhillonlaw.com
2  KRISTA L. BAUGHMAN (SBN: 264600)
   kbaughman@dhillonlaw.com
3  DHILLON LAW GROUP INC.
   177 Post Street, Suite 700
4  San Francisco, California 94108
   Telephone: (415) 433-1700
5  Facsimile: (415) 520-6593
6
7  Attorneys for Plaintiff Yousef Khraibut

8  **UNITED STATES DISTRICT COURT**

9  **NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

10
11  YOUSEF KHRAIBUT, an individual,          Case Number:

12          Plaintiff,                       **COMPLAINT FOR:**

13      v.                                   1.   **Wrongful Termination in Violation**
                                                  **of Public Policy**
14  GURBAKSH CHAHAL, an individual;          2.   **Workplace Harassment in Violation**
    NIKHIL SHARMA, an individual;                 **of the Fair Employment and**
15  GRAVITY4, INC. d/b/a GRAVITY4                 **Housing Act**
    SOFTWARE, INC., a Delaware            3.   **Discrimination in Violation of the**
16  corporation; and DOES 1-10.                   **Fair Employment and Housing Act**
                                             4.   **Failure To Prevent Harassment and**
17          Defendants.                           **Discrimination**
18                                           5.   **Breach of Contract – Equity**
                                                  **Compensation**
19                                           6.   **Failure To Provide Accurate Wage**
                                                  **Statements**
20                                           7.   **Violation of Labor Code Section 970**
21                                           8.   **Retaliation For Reporting Unsafe**
                                                  **Working Conditions – Labor Code**
22                                                **Section 6310**
23                                           9.   **Intrusion Upon Seclusion**
                                             10.  **Defamation** *Per Se*
24                                           11.  **Intentional Infliction of Emotional**
                                                  **Distress**
25                                           12.  **Unfair Business Practices, Bus. &**
                                                  **Prof. Code Section 17200** *et seq.*
26
27                                           **DEMAND FOR JURY TRIAL**
28



1

Complaint                                                          Case No.

1.      Yousef Khraibut ("Yousef Khraibut," "Khraibut," or "Plaintiff"), by and through his attorneys, Dhillon Law Group Inc., files this Complaint against Gurbaksh Chahal ("Chahal"), Nikhil Sharma ("Sharma"), GRAVITY4, INC., d/b/a GRAVITY4 SOFTWARE, INC. ("Gravity4"), and DOES 1-10 (collectively, "Defendants"). Upon his personal knowledge, or, if so indicated, upon information and belief, Plaintiff alleges as follows:

**INTRODUCTION**

2.      In mid-2014, Plaintiff Yousef Khraibut left his promising entrepreneurial career and his home abroad to accept employment with celebrated digital mogul Gurbaksh Chahal's latest start-up, Gravity4. Khraibut was promised a leading senior management/executive role, millions of dollars of stock options, salary and accommodations, immediate work immigration sponsorship, and – most importantly – the ability to be a founding member of Chahal's new company.

3.      Khraibut looked up to Chahal, believing Chahal's explanations of his very public troubles in his recent past relating to domestic violence, Chahal's stories of being mistreated by his former company, RadiumOne, and Chahal's vision of a game-changing juggernaut in the digital advertising world.

4.      Upon joining Gravity4, Khraibut was exposed to a very different scenario than what Chahal had promised.

5.      Gravity4's vaunted key software turned out to be stolen from another founder's former company.

6.      Sales leads and other key documents and data turned out to be stolen from Chahal's former company, RadiumOne.

7.      Chahal and Gravity4 withheld Khraibut's promised pay, employment agreement, immigration sponsorship, and stock options.

8.      Chahal, fueled by a toxic cocktail of prescription drugs, party drugs, alcohol, and sycophants, subjected his associates and Gravity4 employees to daily abuse, humiliation, racist taunts, extortionate manipulation, tales of revenge, and threats of violence.

9.      Finally, when Khraibut dared to stand up to Chahal's abuse, threats, and illegal behavior, Chahal repeatedly threatened Khraibut with violence, fired him, and hustled him out of the

Complaint                                                                                                Case No.

country, hounding him with continued threats, stalking, defamation, interference, and manipulation. Khraibut brings this action to vindicate his legal rights, and to stop Chahal from repeating these practices against other unknowing victims in the future.

### THE PARTIES

10.  Khraibut is an individual who, at all times relevant to the Complaint, was a citizen of both Kuwait and Canada, but not of the United States. Khraibut is also known by the name of Yousef bin Taleb al Khraibut.

11.  Chahal is an individual who, at all times relevant to the Complaint, was a citizen of the United States domiciled in San Francisco, California. Chahal is the Founder, Chairman, and CEO of Gravity4, a digital advertising company that Mr. Chahal has claimed publicly to have a market capitalization value of over one billion dollars, and a near future initial public offering value of over three billion dollars.

12.  Sharma is an individual who, at all times relevant to the Complaint, was a citizen of the United States domiciled in San Francisco, California. At all times relevant to the Complaint, Sharma has been an employee of Gravity4, holding various positions and roles ranging from intern to his current role with "Platform Partnerships" at Gravity4, according to career website LinkedIn.

13.  Gravity4 is a corporation that, at all times relevant to the Complaint, was incorporated under the laws of the state of Delaware, with its principal place of business in San Francisco, California. Gravity4 sometimes does business under the name "Gravity4 Software, Inc." Gravity4 is registered with the California Secretary of State for the purpose of transacting business in California.

14.  Upon information and belief, Khraibut alleges that DOES 1 through 10 are the partners, agents, owners, shareholders, managers, or employees of Gravity4 and/or Chahal, and are, or at relevant time were, acting on Gravity4 and Chahal's behalf. Upon information and belief, Khraibut alleges that each and all of the acts and omissions alleged herein were performed by, or are attributable to, Chahal and Gravity4, and DOES 1 through 10, with each having the legal authority to act as the agent for the other. Upon information and belief, all DOES were domiciled in California at all times relevant in the Complaint. The acts of any and all Defendants were in accordance with, and represent, the official policy of all Defendants.



Complaint                                                                                                  Case No.

15. Khraibut is unaware of the true names or capacities of the Defendants sued herein under the fictitious names DOES 1 through 10, but prays for leave to amend and serve such fictitiously named Defendants once their names and capacities become known.

**JURISDICTION AND VENUE**

16. This Court has diversity jurisdiction of the state law claims under 28 U.S.C. § 1332(a), because the amount in controversy exceeds $75,000, exclusive of interest and costs, and all parties to this action are citizens of different states. Plaintiff is a citizen of and domiciled in Ontario, Canada. He is also a citizen of Kuwait. Plaintiff is not a citizen of the United States and therefore is not a citizen of any state, including California. Plaintiff is not lawfully admitted for permanent residence in the United States, and is not domiciled in California. Upon information and belief, each Defendant is either a citizen of California, has sufficient minimum contacts in California, or otherwise intentionally avails himself or itself of the California market so as to render the exercise of jurisdiction over it or him by the California courts consistent with traditional notions of fair play and substantial justice.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(e), because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district. Furthermore, venue is proper because, upon information and belief, one or more of the named Defendants resides, transacts business, or has offices in the County of San Francisco, and the unlawful practices, acts, and omissions alleged herein took place in the County of San Francisco.

**INTRADISTRICT ASSIGNMENT**

18. This Complaint is assigned to the San Francisco Division pursuant to Civil Local Rules 3-2(c) and 3-2(e), because a substantial part of the events or omissions giving rise to the claims occurred in San Francisco, San Francisco County, California.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

19. On July 21, 2015, Khraibut filed an administrative complaint against Gravity4 and Chahal with the Equal Employment Opportunity Commission ("EEOC"), which cross-filed the complaint with the California Department of Fair Employment and Housing ("DFEH").

20. On August 13, 2015, the DFEH issued Khraibut a right-to-sue letter. On August 21,

Complaint                                                                                                          Case No.

1    2015, the EEOC also issued Khraibut a right-to-sue letter.

2        21.     Khraibut exhausted the necessary administrative remedies for the relevant claims in

3    this Complaint by filing the above-referenced charge of discrimination with the DFEH, and obtaining

4    a right-to-sue letter.

5                                    **FACTUAL ALLEGATIONS**

6                            **Chahal and Khraibut Become Acquainted**

7        22.     Chahal is a serial digital advertising entrepreneur.

8        23.     Chahal, who is now 33 years old but was a teenager when he started and sold his first

9    digital advertising company, has cultivated an image in the media of a young immigrant who dropped

10   out of high school to pursue his dreams of business success. Among other venues, Chahal appeared

11   on the Oprah Winfrey talk show in 2008 on a segment about "Millionaire Moguls," discussing his

12   "rags to riches" fame, his family values, his Lamborghini sports car, and his "eligible bachelor"

13   status.

14       24.     Like Chahal, Khraibut is a young, digital entrepreneur, aged 20 as of the filing of this

15   Complaint.

16       25.     At the age of 16, Khraibut founded a media company, Brotips Media, which attracted

17   substantial private investment from billionaire investor Mark Cuban and others, before being

18   acquired in a multi-million-dollar merger in 2013.

19       26.     While he was running Brotips Media, starting in or about 2012, Khraibut interacted

20   with Chahal, who was then the founder and CEO of RadiumOne, a digital advertising company

21   Chahal had founded. The two stayed in touch, corresponding occasionally during the years leading

22   up to the summer of 2014.

23       27.     Khraibut, whose talents include product architecture and design, worked on several

24   projects for RadiumOne while Chahal was its CEO.

25       28.     Khraibut is the founder of Khraibut Atelier, a strategy think tank contracted by the

26   defense sector and private companies to architect and design complex digital initiatives.

27             **Chahal's Violent Recent Past: First Domestic Violence Incident**

28       29.     In or about August 5, 2013, Chahal was arrested for a violent assault on his girlfriend

Complaint                                                                                    Case No.

in his San Francisco penthouse condominium, which was captured on video surveillance cameras in the apartment. According to law enforcement reports, the video, which was seized during a police response to a 911 call, showed Chahal hitting and kicking the woman approximately 117 times in less than an hour.

30.     The San Francisco District Attorney charged Chahal with 45 felony counts of domestic violence following the incident.

31.     On April 16, 2014, Chahal pled guilty to two misdemeanor counts of assault, after a San Francisco Superior Court judge suppressed the videotape evidence of the beating on Fourth Amendment grounds, and dismissed many of the charges against Chahal. The San Francisco District Attorney's office also reported a lack of cooperation from the crime victim.

32.     Chahal was sentenced to three years of probation, a year of domestic violence courses, 25 hours of community service, and a $500 fine. Upon information and belief, as part of the plea deal, the District Attorney's office gathered and destroyed all copies of the videotape of the beating within the District Attorney's office, in an unusual conclusion to a highly publicized case. Upon information and belief, the original digital video recorder that documented the beating was returned to Chahal or his attorneys at the conclusion of the case.

33.     On April 26, 2014, in the wake of a firestorm of criticism of Chahal and RadiumOne, including TechCrunch dropping RadiumOne as a sponsor of its conference in New York, the board of directors of RadiumOne fired Chahal as Chief Executive Officer of RadiumOne. Upon information and belief, this firing occurred despite Chahal's plea to the board that he had admittedly committed certain regrettable acts while off his medications, but that he should be forgiven for these transgressions and be allowed to remain at the helm of RadiumOne.

34.     After his firing, Chahal launched a social media campaign, vowing to get even with RadiumOne, challenging his firing, accusing police of brutality in his arrest, accusing his former girlfriend of being a prostitute as his justification for the conduct that led to his conviction, denying that he had assaulted his girlfriend, and publicly releasing numerous emails with RadiumOne board members and lawyers to support his claim that he had pled guilty at their behest, even though he was completely innocent, and could have prevailed at trials. Upon information and belief, Chahal later



deleted these emails from public view, although news reports of them remain online.

35. As a result of the post-conviction publicity Chahal generated, including his public assertion that he was innocent of the charges of domestic violence, Khraibut renewed his relationship with Chahal, who he looked up to as a mentor, in the late spring of 2014.

36. Khraibut offered Chahal moral support during the period following Chahal's firing by RadiumOne in the wake of the guilty plea, fully believing Chahal's public and private protestations that his arrest and firing had been part of a conspiracy to divest Chahal of his ownership interest in RadiumOne, and a "shakedown" by his former girlfriend, to whom he frequently referred throughout Khraibut's employment, and upon information and belief, continues to refer to orally and in writing, as a "whore" and a "prostitute."

**Chahal Recruits Khraibut as Gravity4's Third Employee**

37. In the first half of June 2014, as Chahal was starting Gravity4 with co-founder and Chief Product Officer Dan Grigorovici, the three men discussed a leadership role for Khraibut at Gravity4.

38. On or about June 17, 2014, Chahal and Grigorovici made a presentation to Khraibut about Gravity4 for the purpose of recruiting Khraibut to join Gravity4.

39. On June 18, 2014, Khraibut followed up on the presentation, sending Chahal and Grigorovici an email proposing terms of employment, including:

    a. Role of product manager (design and engineering) with focus on user experience, user interface, design, product and platform strategy;

    b. Initial startup salary of $9,200 per month;

    c. Founder stock options, incentivized bonus structure;

    d. Short term accommodations in San Francisco while in transition;

    e. Visa sponsorship to work in the US;

    f. Aesthetic authority over projects managed.

40. A few minutes after Khraibut sent his email proposing terms, Chahal responded, "The salary is a bit high for this early stage in the game. Let's discuss this email in detail today." Chahal did not take issue with any of the other proposed terms besides the proposed initial salary.



Complaint

Case No.

41.     Khraibut and Chahal discussed terms of employment on the telephone, with Khraibut still in Ontario, Canada, and Khraibut stressed that he was more motivated by being a founding member and having equity in a valuable company that was going to revolutionize digital advertising and be worth billions – as Chahal had represented Gravity4 would be – than by salary.

**Khraibut Joins Gravity4 As a Founder-Level Employee**

42.     After some discussion, Chahal and Khraibut eventually agreed on the following employment terms orally:

      a.    $6,000 per month salary;

      b.    Rent for an apartment near the office;

      c.    1% equity in Gravity4 in the form of founder stock options, with immediate vesting; and

      d.    Immediate employment visa sponsorship.

43.     Khraibut began work for Gravity4 on June 22, 2014. Chahal insisted that Khraibut begin work immediately, even before his visa paperwork came through, because Chahal wanted to launch Gravity4 on his birthday, July 17, 2014. Khraibut was the first employee hired by Gravity4 after Chahal and Grigorivici, with significant duties toward the launch.

44.     Khraibut was neither presented with, nor signed, any employment related documents when he joined Gravity4. Indeed, he was the third employee, and there was no human resources department, recruitment team, or administrative infrastructure whatsoever.

45.     On June 27, 2014, Chahal made an email introduction between Khraibut and an immigration law firm, instructing Khraibut to send his resume to the lawyers, presumably for a visa application.

46.     On June 30, 2014, Chahal personally charged a round-trip ticket for Khraibut from Toronto, Canada to San Francisco, California, to Chahal's American Express card. The travel was to be on July 3, 2014, ostensibly returning to Canada on July 17, 2014. Chahal suggested that the ticket be booked round-trip, with the return ticket to be cancelled later, for the purpose of Khraibut having a smooth encounter with U.S. immigration authorities at the airport.

47.     On July 3, 2014, presumably in order to facilitate Khraibut's international travel,



1    Grigorovici sent Khraibut a letter signed by Grigorovici and dated July 2, 2014, stating that Khraibut

2    was Grigorovici's friend, and would be visiting Grigorovici for two weeks, staying with him at

3    Grigorovici's Pleasanton residence. The letter was addressed "To whom it may concern."

4         48.    Upon arrival in San Francisco on July 3, 2014 Khraibut initially resided in a San

5    Francisco hotel for approximately a week, before moving to Chahal's penthouse condominium unit

6    in San Francisco.

7         49.    Soon after he arrived in San Francisco, Khraibut was gifted a used white iPhone 5 by

8    Chahal, who informed Khraibut that the phone had been used previously as a corporate phone by

9    Chahal's executive assistant at RadiumOne.

10        50.    Chahal    caused    Gravity4    to    issue    Khraibut    a    Gravity4    email    account,

11   yk@gravity4.com, on July 9, 2014.

12        51.    Gravity4 rented a junior one-bedroom apartment for Khraibut in the same building in

13   which Chahal lived, starting in or around August 1, 2014. Khraibut's name was on the lease, which

14   was for a monthly rent of $3,600, guaranteed and paid for by Gravity4.

15                    **Khraibut is Involved in Every Aspect of Gravity4's Business**

16        52.    Khraibut arrived to San Francisco, only to discover that Gravity4 had only three

17   employees, and no infrastructure. Although Khraibut and Chahal discussed a Product Manager role,

18   Khraibut was offered the title and role "Head of Design" by Chahal at a meeting at Chahal's

19   condominium, and accepted that designation. Khraibut was known to all Gravity4 employees and

20   vendors as Gravity4's "Head of Design."

21        53.    In his capacity as the head of design and user interface at Gravity4, Khraibut worked

22   tireless start-up hours around the clock, including sometimes twenty hours a day in the office,

23   sending and receiving thousands of emails with teams of offshore workers in Russia, Poland, Turkey,

24   and India.

25        54.    From the start of his tenure at Gravity4, Khraibut was involved in or conducted the job

26   interviews for virtually every employee who joined during his tenure, and every prospective

27   employee who was interviewed but did not join.

28        55.    As a leading company interviewer, Khraibut worked closely with Gravity4's head of

Complaint                                                                                        Case No.

recruitment, Staci King, who was an outside consultant during Khraibut's tenure, coordinating job listings, candidate interviews, job offers, and equity package details with her.

56. A senior management employee who routinely extended job offers to candidates upon Chahal's approval, Khraibut was aware of the types of compensation packages offered to the majority, if not all, of Gravity4's early hires, including their equity packages.

57. Khraibut's interviews included a July 9 interview of Sharma, then an 18-year-old who was hired at the end of the interview as an intern whose role, at least in part, was to support Khraibut, as indicated by an email from Chahal on July 9 referring Sharma to Khraibut as "your employee." Following the interview, Khraibut offered Sharma terms of employment, including a salary of $900/month, travel and accommodations. As this and other examples make clear, Khraibut occupied a senior, responsible management role at Gravity4.

58. Besides design, front-end engineering and hiring, Khraibut was involved in and copied on correspondence regarding every aspect of the business, from mergers and acquisitions and product direction, to privacy policies and more.

59. Khraibut's design work throughout his tenure included supervising an offshore design and implementation team in India. His work in this regard began on June 25, 2014, even before he arrived in San Francisco, after Chahal sent the Indian consultants at "netsolutionsIndia.com" an email introducing Khraibut as Gravity4's "head of design and UI [user interface]," and instructing them to take direction from Khraibut.

60. Khraibut's duties at Gravity4 included purchasing equipment for Gravity4, including computer equipment at the Apple store. Chahal directed Khraibut and other employees to use Chahal's credit card for authorized business expenses of this nature.

61. Khraibut's involvement in all affairs of Gravity4 extended to his participation in discussions about Gravity4 corporate acquisitions. Khraibut was aware of numerous representations made by Chahal to third parties about Gravity4, its business, its software, its stock value, its competitive advantages, and its projected growth.

62. Khraibut was routinely copied on Chahal's communications with the handful of senior management at the company. For example, on September 23, 2014, Chahal copied Khraibut as part



of the email group management@gravity4.com on an email concerning Chahal's work "finalizing the legal docs for closing the countly, xp, Sendloop, and Argyle deals," referring to intended acquisitions by Gravity4.

**Chahal Hedges, Dodges, Reneges on Stock Option Compensation, Immigration**

63.    Nearly every employee hired at Gravity4, other than interns such as Nikhil Sharma, was offered a portion of his or her compensation in stock options, a common practice in the technology industries.

64.    Upon information and belief, every management-level employee recruited to Gravity4, like Chahal, was offered stock options as part of his or her compensation. As an executive, Khraibut frequently presented new hires with an employment package approved by Chahal, which almost always consisted of a combination of specific salary and options. New hires were induced to sign by being told that the options were priced at a penny a share. However, hires later complained that the employment packages that they were presented with did not include the one cent a share price, or any price, and were told by Chahal or Loungamath or others that the pricing would come later, sometimes being told that the pricing would be set at a board meeting to happen in the immediate future.

65.    Chahal made a point during his recruitment of new hires to tout the anticipated three-billion-dollar-plus value of Gravity4 at IPO in the near future, thus making the value of the equity compensation a material portion of all management-level employment offers.

66.    Following Chahal's offer of employment as a founder, and Khraibut's acceptance and start of work at Gravity4, Khraibut followed up with Chahal several times about a written employment agreement and documentation of the promised stock options, as other senior company management and even entry level sales and engineering employees received. Numerous times, Chahal dodged the issue, often calling Khraibut a "pussy" for asking about his promised compensation, and employment documentation.

67.    On August 10, 2014, Chahal and Khraibut corresponded about the immigration process and stock option documentation. Chahal instructed Khraibut to review the resume of Alex Wheldon, another young, early hire of Gravity4 whose immigration papers were ostensibly being

Complaint                                                                                                           Case No.

1    processed by Chahal's immigration counsel.

2        68.    Like Khraibut, Wheldon was a foreign national, and was working in the United States

3    at Chahal's invitation without prior work authorization. Unlike Khraibut, Wheldon was a white

4    European, and unlike Khraibut, Wheldon received an offer letter, and was paid (in cash) during his

5    employment. Khraibut began to realize that he was being treated differently than other Gravity4

6    employees, including Wheldon, in the terms of his compensation and employment.

7        69.    Upon being pressed yet again by Khraibut during the August 10, 2014 correspondence

8    for documentation of salary and equity promises, Chahal responded that they had agreed upon salary

9    before Khraibut began work, and "as far as equity, I am going to be more than fair with that. Because

10   it can't be public with any executive," clearly acknowledging that Khraibut was a senior/executive

11   entitled to company equity as part of his compensation, and as Chahal had earlier promised.

12       70.    After Khraibut reiterated that he had joined Gravity4 not for the salary but for

13   Chahal's equity promise, Chahal responded, "Then stop being a pussy and give me your resume so I

14   can first make you legal."

15       71.    Chahal had already been given Khraibut's resume well before Khraibut was hired to

16   work at Gravity4, but used the resume excuse to delay paying Khraibut and honoring his promise of

17   1% stock options and written confirmation of wage compensation.

18       72.    Chahal went on to suggest that Khraibut, rather than pursue U.S. work papers through

19   the legal process, instead become authorized to work in Bermuda or Ireland, and yet continue work in

20   the U.S. as if he had U.S. work authorization.

21       73.    Khraibut rejected this proposed sham arrangement, asking if it would be helpful to

22   seek other avenues for U.S. work authorization, but Chahal repeated the offshore suggestion, stating

23   that he himself was planning to become a Bermuda resident, presumably for tax purposes.

24       74.    Khraibut continued to press the issue of the lack of compensation and promised stock

25   option paperwork, until his last day at Gravity4. Khraibut was never given an employment contract to

26   sign, perhaps because Chahal never intended to follow through on the promises of immigration

27   sponsorship that had been a material inducement to get Khraibut to move from Canada to San

28   Francisco for the job.



Complaint                                                           Case No.

**Chahal Creates a Toxic and Hostile Work Environment From Day One at Gravity4**

75. Gravity4's hiring efforts were focused in part on hiring women executives and employees to combat Chahal's negative image in the wake of his domestic violence conviction.

76. Gravity4's female hiring efforts were colored by Chahal's focus on women's appearances during the hiring process. In one instance, Chahal researched a young, attractive female sales manager applicant by finding online photographs of her wearing a bikini, and then showing them to other male employees, including Khraibut, seeking their opinion on her breasts. When Khraibut protested via Skype chat that it "wasn't right" to be checking out a prospective hire's bikini pictures, Chahal responded, "research bro. everything is online. I do this on EVERY CANDIDATE."

77. The woman described above was hired by Gravity4 in an account manager intern position, but like virtually every other employee at the company, did not last long, and was abruptly fired along with several other women and men in April, 2015.

78. Chahal treated senior female executives at Gravity4 with particular disrespect. For weeks before he fired the company's first senior marketing executive, he ignored her, belittled her, froze her out, and disparaged her behind her back to Khraibut and other executives. Chahal berated employees who would not accept the view that the female executive was "incompetent," and suggested that employees avoid her in fear of a lawsuit.

79. When the female marketing executive suggested to Gravity4's head of global recruiting, Staci King, that for the benefit of the company's marketing efforts, Chahal should "come clean" about his domestic violence incident and take responsibility for it, Chahal leaned on Khraibut to "orchestrate" the executive's termination, which Khraibut refused to do. Chahal ultimately terminated her himself on a pretext.

80. Upon information and belief, after the woman was fired, and later hires asked why she was terminated, Gravity4's recruiting manager Staci King disparaged her in writing, stating that she had been hired because of her gender, but was under qualified for the job, and subsequently fired.

81. In another incident relating to women hires, Chahal discussed with Khraibut and other male executives Chahal's internal conflict about whether or not it was a good idea to extend a job offer to an attractive woman with whom Chahal had had a brief, casual sexual relationship. Chahal



Complaint                                                                                      Case No.

ended up offering his former lover the job as an administrative staffer, and she accepted the job, but changed her mind before joining the company. Upon information and belief, the woman declined the job due to Chahal's reputation for disrespectful treatment of women.

82.     Chahal frequently referred to women in the workplace in both vulgar and derogatory terms. For example, during the hiring process, Chahal would refer to allowing an attractive woman to proceed in the interview process, as a "pussy pass."

83.     Chahal would use the term "on PMS" as a derogatory slur toward men executives, including Khraibut, who were having a difficult day, on one occasion insisting to Khraibut that Khraibut had "straight PMS." References to "PMS" or pre-menstrual syndrome in the workplace are commonly viewed by male and female listeners alike to be derogatory put-downs of women workers.

84.     Chahal's gross disrespect for individuals he worked with was not limited to women. Chahal used ethnic slurs in the workplace on a habitual basis, both orally and in writing, particularly against non-Anglo-Saxon-male-employees.

85.     Among the ethnic slurs specifically directed at Khraibut in writing included "Arab ghetto" and "habibi ghetto." Orally, Chahal called Khraibut a "terrorist" on numerous occasions, and said that ISIS/ISIL terrorists were "his [Khraibut's] people." Chahal humiliated Khraibut with these racist slurs both privately, and in front of Khraibut's co-workers.

86.     Chahal habitually disparaged business colleagues outside Gravity4 as well. Chahal made remarks in a Skype chat about Gravity4 business partners such as "never trust TURKS."

87.     On another occasion, Chahal discussed a digital sales executive from a rival advertising agency, who had been offered a job with Gravity4, but had questioned Gravity4's predicted sales ramp due to concern over Chahal's domestic violence controversy.  Referring to the man as a "nigger," Chahal said he had told a fellow Gravity4 executive to tell the prospective hire to "shove a rock up his ass."

**Chahal's Obsession with "Getting Even" with RadiumOne**

88.     Chahal's obsession with his former employer, Radium One, was a ubiquitous theme in all of Chahal's business dealings at Gravity4.

89.     Early in Khraibut's relationship with Chahal as a Gravity4 employee, Chahal asked

Complaint                                                                                              Case No.

Khraibut and Grigorovici to accompany him to a July mediation with RadiumOne and its law firm, Wilson Sonsini Goodrich & Rosati, in San Francisco. Khraibut and Grigorovici did accompany Chahal to the mediation, and both waited outside the mediator's offices while the mediation was taking place, but spoke frequently with Chahal at intervals during the mediation, including having lunch with him during the mediation.

90.     Khraibut was asked to accompany Chahal to several other mediations during the course of Khraibut's employment with Gravity4.

91.     On several occasions, Chahal would put his then-lawyers on speakerphone while Khraibut was with Chahal, and would speak with his lawyer about legal matters, including personal litigation matters, in the presence of Khraibut and others. On some of these calls, Chahal's lawyer would criticize Chahal due to his incessant need to ignore the lawyer's advice and share documents and details that supported his personal narrative, with the lawyer even threatening to drop Chahal as a client on several occasions. At other times, Chahal would put his lawyer on speakerphone while with Khraibut and sometimes others, and listeners would hear Chahal's lawyer having confrontational discussions with lawyers adverse to Chahal. Chahal expressed glee to Khraibut and others whenever Chahal's lawyer took extreme positions and used bombastic rhetoric against other lawyers and parties on Chahal's behalf.

92.     Upon information and belief, Chahal included Khraibut in all legal discussions and discussions about the RadiumOne board, with the manipulative agenda of instilling loyalty and attempting to motivate Khraibut, who was not paid for his work during his employment tenure. Sharing his legal matters with Khraibut was also a way to demonstrate Chahal's wealth and power compared to Khraibut, and thereby intimidate him.

93.     Chahal expressed interest in retaining Khraibut to write his second book, after the ghostwriter for Chahal's first book, "The Dream: How I Learned the Risks and Rewards of Entrepreneurship and Made Millions," become irresponsible and unreliable to Chahal. At other times, Chahal discussed other employees potentially ghost-writing the book. In retrospect, these mentions of ghost-writing a book about Chahal were yet more attempts to manipulate Chahal's young employees via a combination of flattery and exhortation to accompany him everywhere and be



Complaint                                                                                                        Case No.

part of his entourage at all times.

94.     Chahal frequently mentioned to Khraibut that he had retained former San Francisco Mayor Willie Brown Jr. to exert political influence on his criminal conviction process, including mentioning the quarter-million-dollar deposit Chahal paid the politician as a "consulting fee" to pressure San Francisco District Attorney George Gascon to dismiss the domestic violence charges, and in general "fix" this problem for Chahal and RadiumOne.

95.     Chahal also described how RadiumOne board member Steve Westly, who is a venture capitalist and former State of California Controller, suggested hiring Brown, made the introduction, and arranged Chahal's first meeting with Brown. Chahal described to Khraibut how Brown was hired because he had gotten District attorney Gascon, appointed to his office, how Brown had a close personal relationship with California Attorney General Kamala Harris, and how Brown had the "juice" to make the criminal charges disappear. Chahal also mentioned that a powerful friend of the politician and the District Attorney, a real estate development named Victor Makras, played a role in making the charges go away, acting as a go-between for Brown in the discussions.

96.     Khraibut, a Canadian citizen, had no personal knowledge about any of these political figures or their history, but it was clear to him that Chahal was trying to impress upon Khraibut the vast scope of Chahal's power and influence, through his hired political "consultants."

97.     Chahal later expressed his dissatisfaction with Brown's performance on several occasions to Khraibut, and on one occasion, Chahal described a near-confrontation with Brown in the St. Regis hotel lobby in San Francisco while Chahal was with his bodyguard Alaisa, and others. Chahal boasted that he had forced Brown to give back much of the original retainer that Chahal had paid him.

98.     Khraibut took these frequent mentions of the hundreds of thousands of dollars paid to a powerful California politician in connection with the desired dismissal of the most serious claims against him, and the later discussions about the confrontation, as a veiled threat that if Khraibut ever crossed Chahal, Chahal could and would exert paid political influence to suppress any legal consequences.

99.     Along with other employees of Gravity4, Khraibut learned from a company-wide

email in late September, 2014 that a term of the settlement agreement with RadiumOne and Chahal was that Gravity4 and RadiumOne agreed not to hire or solicit each other's employees for a period of two years from September, 2014. Gravity4 employees were instructed to inform recruiting manager Staci King if they were ever contacted directly or indirectly by RadiumOne. In this way, Khraibut and others were given the message that RadiumOne was off limits to them as a potential future employer, thereby limiting their options to get away from the toxic environment at Gravity4.

## Chahal Outlines Gravity4's Fraudulently Obtained Computer Code

100.   During the course of his employment at Gravity4, Khraibut worked closely with other executives to help "put out fires" and roll out various aspects of the business. Khraibut had a hand in the launch of all company products during his tenure.

101.   One troublesome issue that Khraibut became aware of, very early on during his tenure with Gravity4, was the ownership and source of Gravity4's original operational software, the company's key intellectual property, known as its "DMP", or data management platform. It was Khraibut's job to design the front-end UI or user interface for the software, which ostensibly teams of computer programmers were developing the architecture and software that would support the company's functions.

102.   At various times in or about July and August, 2014, Chahal disclosed to Khraibut that Gravity4's DMP, which would have cost several million dollars and taken months or years for teams of developers to create, had been taken by co-founder Dan Grigorovici from his former employer, Lotame, which had acquired the company AdMobius, founded by Grigorovici. At the time, Gravity 4 was less than two months old, and it would have been impossible for the company to have developed a DMP from scratch, yet Khraibut was presented by Grigorovici with what appeared to be a fully formed DMP to work with to do Khraibut's design interface work.

103.   Grigorovici had served as the CEO and then Chief Product Officer of AdMobius, before becoming an executive of Lotame for less than a year before departing to join Gravity4 – with Lotame's DMP, apparently unbeknownst to Lotame.

104.   Chahal confessed to Khraibut that even prior to taking Lotame's software, upon information and belief, Grigorovici had brought software belonging to a prior employer, Quattro



Complaint                                                                                                          Case No.

1   (acquired by Apple) with him to found AdMobius, again without Apple's knowledge or consent.

2        105.    At first, Chahal himself did not have access to the DMP, which Grigorovici kept under

3   tight control, and which was shared only with a handful of engineering and design employees.

4   Grigorovici personally gave a copy of the closely guarded DMP to Khraibut. Khraibut was later

5   given other versions of the code on various occasions during his tenure at the Company. Chahal

6   himself had little to no access to or involvement with the code, other than knowing about its origins

7   and authorizing its use.

8        106.    Khraibut soon learned firsthand that the Gravity4 DMP software had been taken from

9   Lotame. In a telephone text message exchange, Grigorovici asked Khraibut to review images of a

10  user handbook for the code that Grigorovici had been working on.

11       107.    Khraibut reviewed the images as requested by Grigorovici, and responded that "every

12  page" of the images he saw were stamped "admobius confidential."

13       108.    Grigorovici responded, "Fuck … I'll have to scrub it page by page" referring to

14  certain images of code but not the code itself. As to the code itself, Grigorovici wrote, "I scrubbed

15  the code real good tho … it's clean like a virgin."

16       109.    During a later conversation while they were together, Grigorovici further elaborated

17  and admitted to Khraibut that he had taken the Lotame DMP when he left. He sometimes professed

18  an entitlement to the stolen code, expressing that he felt he had been mistreated at Lotame.

19       110.    Khraibut questioned Grigorovici and Chahal about the use of another company's

20  intellectual property, expressing grave discomfort and concern over Khraibut's being asked to

21  condone corporate espionage/trade secret theft/copyright infringement.

22       111.    Grigorovici and Chahal brushed off Khraibut's repeated expressions of concern,

23  including Khraibut telling Grigorovici that his actions could implicate Gravity4 and employees.

24       112.    Grigorovici specifically stated to Khraibut words to the effect, "don't worry, I used

25  my wife Ethel's laptop [to take the code], and it's going to be hard for [Lotame, etc.] to accuse me."

26       113.    It slowly began to become known to other engineering employees of Gravity4 besides

27  Khraibut, that the code had been taken from another company and was not created natively by

28  Gravity4.



Complaint                     Case No.

114.     Khraibut was copied on e-mails containing documents that were confidential and proprietary to other companies, including those of Dan Grigorovici's previous employers, such as user guides for company code.

115.     On one occasion, in an e-mail of August 4, 2014, Khraibut was sent two confidential documents he believes were taken improperly from Quattro and Lotame (through AdMobius).

116.     One document, entitled "Requirements Document – Self-Service M1 Overall & Advertiser" contains tracked changes demonstrating that Grigorovici had stolen it from Quattro, and simply used the "search and replace" feature in Microsoft Office to remove Quattro's name and to replace it with "G4" (Gravity4).

117.     Yet another document, entitled, "Cross Platform Data Management (UDP)", contained images stamped with the name, "AdMobius," which Grigorovici admitted to Khraibut in text messages he would be removing, even though it was "bitch work."

118.     Upon information and belief, both documents contain highly sensitive examples of proprietary code, and other information that was intended to be kept confidential within Grigorovici's former employers. During the time of his employment with Gravity4, Khraibut was shown the actual DMP code taken from Lotame, aside from the code in the "Cross Platform Data Management (UDP)" and "Requirements Document – Self-Service M1 Overall & Advertiser."

119.     On another occasion, on September 12, 2014, in a document titled, "Compilation," an internal programmer at Gravity4 noted that while he was working on the DMP he "had to change names for a good chunk of files (the class had been refactored to *g4*.. but the file name was still *Admo* [sic]." Upon information and belief, "Admo" stands for "AdMobius."

120.     Additionally, upon information and belief, Khraibut reviewed a file that contained interview questions in order to hire a Java programmer/technician who could alter the DMP stolen from AdMobius. Three out of the five questions read as follow:

        a.   "You're given a product originally designed to run in a single location/on a single server instance. This now needs to be updated to work in a distributed and scalable setup based in several different global data centers. How would you approach this

Complaint                                                                                                                                    Case No.

1    problem?  What kind of changes would you make to the codebase? To the

2    database?

3    b. "What does your first day look like with DMP? You're given 25,000 source files

4     and 110 pages of mishmash documentation."

5    c. "If you had to rebuild the DMP from scratch, what languages and technologies

6     would you use and why?"

7    121. Upon information and belief, the DMP that Grigorovici brought to Gravity4 from

8 Lotame, was significantly engineered during the summer and fall of 2014 to the point where it may

9 no longer be recognizable as the property of Lotame or others. However, prior, less-engineered

10 copies of the code existed at the company at the time Khraibut left it.

11    122. The value of the DMP and related documentation that Grigorovici brought with him to

12 found Gravity4 was such that Chahal was willing to give Grigorovici the title of "Co-Founder/"

13 Chahal confided to Khraibut, outside Grigorovici's presence, that he had never before made someone

14 a co-founder of one of Chahal's companies, and would never have done so with Grigorovici, had it

15 not been for the software that Grigorovici brought along with him. Chahal told Khraibut that Chahal

16 had given Grigorovici 2.25% of Gravity4's stock as part of his compensation, including for bringing

17 over the software from Grigorovici's former employer. Chahal privately expressed to Khraibut his

18 desire to somehow "get rid of" Grigorovici by means of getting "dirt" on him and using it against

19 him, if he could, now that Gravity4 had the software.

20    **Chahal Arranges to Steal, Use RadiumOne's Publisher List**

21    123. Early in Khraibut's tenure with Gravity4, he was informed by Chahal that Chahal was

22 going to hire Laura Castaneda, a then-RadiumOne senior marketing employee who would bring with

23 her RadiumOne's highly proprietary list of publisher data, representing carefully built relationships

24 with major online publishers, and specifying those publishers' uses of tools that Gravity4 might offer,

25 and their particular demands and needs.

26    124. Castaneda did come to work for RadiumOne, on or about the second half of July

27 2014, and she worked at the company for approximately four months. She did bring RadiumOne's

28 publisher list with her, which Chahal arranged to have distributed to key sales and marketing staff at



1   Gravity4 for their use. Upon information and belief, RadiumOne was not aware that Castaneda had

2   taken this proprietary information with her when she left.

3       125.    Khraibut was asked to design and manage online tools relating to the publisher lists

4   and related marketing materials that Castaneda brought from RadiumOne.

5       126.    Khraibut asked Chahal why he was able to start Gravity4 so soon after leaving

6   RadiumOne, including with materials apparently taken from RadiumOne. Chahal responded that he

7   did not have a noncompete or nondisclosure agreement with RadiumOne, and thus was able to freely

8   use its information and compete with it.

9                    **Chahal's Penchant for Surreptitious Surveillance of Employees and Associates**

10      127.    As an early hire of Gravity4, Khraibut was one of the first occupants of Gravity4's

11  leased office space at One Market. When originally touring the space, and later, he was told by

12  Chahal that the office suite had been prewired for audio and video surveillance by the master tenant

13  from whom Gravity4 sublet, ARTIS Capital.

14      128.    Chahal frequently participated in employment interviews in the office remotely, by

15  watching them on an iPad or iPhone application while out of the office. Upon information and belief,

16  most of the interviewees, if not all, were utterly unaware that Chahal was surveilling them while they

17  were being interviewed by others.

18      129.    Chahal made frequent use of the practice of listening in on meetings unbeknownst to

19  meeting participants though using the Skype app on mute on his phone or iPad. Khraibut expressed

20  discomfort to Chahal about being forced to listen in on other people's conversations without their

21  knowledge.

22      130.    Chahal made frequent use of surveillance technology to monitor Gravity4 employees.

23  He ordered employees to install keystroke monitoring software on other employees' computers,

24  usually without their knowledge.

25                    **Chahal's Drug Abuse, and Attempts to Involve Others**

26      131.    Chahal, a volume consumer of prescription medications, ranging from mood altering

27  drugs to painkillers and attention deficit drugs, was both obsessed with and paranoid about his

28  medications. At times, he would freely offer them to employees, such as on one occasion when he



disparaged Khraibut for scheduling a dental appointment for tooth pain that Chahal said he could help with, presumably by providing Chahal's prescription painkillers. Khraibut declined this offer, as he declined Chahal's frequently applied pressure to take Xanax on air flights and other occasions.

132.    On many occasions, particularly during the early phases of Gravity4's launch in July and August, 2014, Chahal pressured engineering and other launch-related employees to consume his prescription Adderall, an attention deficit medication widely abused in the technology industry by programmers and developers needing to stay awake for long hours and produce a large volume of work in a short space of time. Chahal pressured Khraibut to take the prescription drug, even pressing upon Khraibut a bottle of Chahal's prescription of the drug, of which Chahal had several.

133.    Khraibut frequently expressed concern about Chahal's pervasive drug and alcohol abuse, both orally and in writing, expressing safety concerns. Chahal usually denied having a problem, or causing problems for others, with his drug habits. On more than one occasion, Khraibut warned Chahal against mixing psychiatric medications and alcohol, but Chahal continued his abuse, which often led him to lash out at business and personal associates including Khraibut.

134.    Chahal, Grigorovici and others also consumed the party drug "Molly" (MDMA) at Chahal's residence, among other places, and pressured Khraibut and other employees of Gravity4 to use the drug also.

135.    When Khraibut persisted in refusing to take MDMA, Chahal disparaged Khraibut, and expressed that he felt he could not trust Khraibut.

136.    At times, Chahal's paranoia over his substance abuse would take the form of asking associates to search other associates' phones for photographic evidence of Chahal's prescription drugs, or Chahal's "partying."

**Chahal's Obsession with Professing His Innocence
Regarding the First Domestic Violence Incident**

137.    Chahal's obsession with RadiumOne was only rivaled by his fixation on convincing his Gravity4 colleagues, prospective hires and the rest of the public, that he was not guilty of domestic violence against his former girlfriend, despite his guilty plea. To this end, even before the start of a prospective hire's contact with Gravity4, Chahal would make sure that his version of the events was told to and acknowledged by the employee or potential employee. This practice included



1  repeatedly telling Khraibut that he had been "set up" and was not guilty of domestic violence against

2  the first alleged victim.

3  138.  Employees, consultants, associates and friends who ever expressed doubt over

4  Chahal's fable narrative were summarily expelled from Chahal's orbit. On several occasions during

5  his employment, Khraibut and other executives at Gravity4, including Wayne Powers (who was hired

6  as President after Khraibut joined), and Michelle Louangamath, then holding the title of Executive

7  Assistant, were asked to listen to a recording in Gravity's online Dropbox account made by Chahal of

8  a telephone conversation with his former girlfriend and alleged victim, in between the time Chahal

9  was arrested and subject to a restraining order barring him from any contact with her, and the time of

10  his guilty plea and conviction.

11  139.  On the recording of the call made during this no-contact period, Chahal and the victim

12  discussed a potential settlement of her claims against him for the assaults, and the victim allegedly

13  expressed regret over having called the police, but then said that a settlement, according to her

14  family, would need to be at least a million dollars.

15  140.  Chahal played this recording (it is unclear whether the victim, like other of Chahal's

16  voyeurism targets, knew she was being taped) as evidence of his position – that he was framed in

17  order for the victim to extort a large settlement from him.

18  141.  Khraibut and other employees found these episodes of being forced to listen to this

19  recording very awkward, but were subjected to them repeatedly nonetheless. As Khraibut later

20  learned in connection with a second domestic violence incident involving Chahal, Chahal would fly

21  into a rage against any employee who questioned or doubted his narrative about the first domestic

22  violence incident.

23  142.  Chahal told business associates that he had handed a file of evidence to many

24  journalists that "exonerated" Chahal from the domestic violence charges, but that the journalists

25  refused to publish the "true" story of his innocence.

26  143.  At the time Khraibut and Chahal first discussed Khraibut's employment at Gravity4,

27  Chahal specifically denied to Khraibut that he had ever assaulted his girlfriend.

28  144.  Chahal claimed he had pled guilty in order to satisfy the Radium One board, and in

Complaint

Case No.

1   order to pave the way for an initial public offering of RadiumOne in 2014.

2         145.    Later, Chahal's story changed, as he and Khraibut spent more time together. Chahal

3   began to admit that he had assaulted his girlfriend, but only because he had found out that she was

4   having sex with other men for money.

5         146.    Chahal at times claimed he hit his girlfriend with a pillow, and rebutted the fact that

6   the District Attorney had originally charged him with assault with a deadly weapon by stating that a

7   pillow could not be a deadly weapon, and that the District Attorney had greatly exaggerated Chahal's

8   conduct.

9         147.    Still later, Chahal's story evolved to admitting that Chahal had struck his girlfriend

10   with his hands, i.e. "just shook her and slapped her," but that he did not hurt her.

11         148.    Chahal told Khraibut that he had been "extorted" to pay the first domestic violence

12   victim two million dollars. Chahal told Khraibut that the woman had originally demanded $200,000,

13   then increased her demand to one million after her family's input, and finally to two million.

14   Khraibut later learned that the amount of the ultimate payment was higher than two million dollars,

15   possibly as much as four million dollars. It was clear in the context of Chahal's discussions with

16   Khraibut about these issues, that the victim had been paid at least in part to "be quiet" and not

17   cooperate with the criminal investigation. She discontinued her cooperation with the criminal

18   investigation several months before the guilty plea.

19         149.    Throughout these discussions about paying off the first victim, which took place in the

20   Gravity4 office and in Chahal's residence, Chahal would express fear and concern about the

21   videotape of the incident, which was seized by the police, eventually suppressed by the court, and

22   apparently destroyed by the District Attorney as an unusual feature of the plea deal, ever getting into

23   the hands of the media or other adverse parties. Chahal also expressed fear of being raided by the San

24   Francisco Police Department, as he knew that his own abusive behavior toward many other

25   associates might eventually lead to the revocation of his probation. Motivated by this fear, Chahal

26   retained a Vegas nightclub bouncer, and flew him – Moepulou Alaisa, to San Francisco, to act as his

27   personal, live-in security guard detail, and to corroborate Chahal's story as a witness in any criminal

28   or civil proceeding Chahal might later encounter.  Chahal also texted business associates, including



Complaint                        Case No.

Khraibut, with the contact information of Chahal's criminal defense counsel, James Lassart, to call in case of Chahal being "raided" or arrested.

150.    Gravity4 employees and agents who challenged Chahal's denial theme soon found themselves terminated. For example, Gravity4's first marketing executive, an early female employee who was hired in part because of her gender, found her tenure abruptly terminated after she recommended to recruiter Staci King, who was having extreme difficulty finding women executives willing to work with Chahal, that Chahal publicly acknowledge fault in the first domestic violence incident, so that he and Gravity4 could move past the issue. The concept of taking responsibility for his actions was anathema to Chahal.

### Chahal's Cult of Personality, Intimidation, Vulgarity, and Impersonation

151.    Chahal's personal style during Khraibut's tenure as a Gravity4 employee included surrounding himself with an entourage of younger, dependent individuals to accompany him, entertain him, and "back him up" at business and social encounters.

152.    Chahal expected his younger employees, including Khraibut, to spend virtually all of their waking hours in his service, including "hanging out" in his condominium and "partying" with him in San Francisco, Las Vegas, and other venues. All the while, Chahal was paying these young cohorts little, as in the case of intern Nikhil Sharma, or nothing, in the case of Khraibut.

153.    Part of Chahal's entourage was his unlicensed bodyguard, Alaisa, a sizeable man with a threatening demeanor, who resided in Chahal's condominium throughout Khraibut's tenure at Gravity4.

154.    During trips to Las Vegas to visit nightclubs and hotels – visits that Khraibut and others including Grigorovici attended – Alaisa would sometimes lift up his shirt to reveal a handgun. On one occasion, Alaisa dropped the gun and picked it back up in front of Khraibut.

155.    Khraibut believed that the purpose of these displays was to intimidate Chahal's employees and associates, including Khraibut.

156.    In private, Chahal would confide his isolation and paranoia to his colleagues, including Khraibut, but around larger groups, including whenever his bodyguard, Alaisa was present, Chahal projected an aura of invincibility, to the extent that he branded Gravity4 as "limitless," and

1    used stock skydiving imagery to portray the company's ethos.

2          157.    Business associates such as Khraibut who resisted Chahal's demand to be part of his

3    posse of reflexive sycophants, were verbally abused and humiliated by Chahal.

4          158.    Another way in which Chahal would intimidate his associates was to show them video

5    footage of a nightclub incident during which one of Chahal's friends violently assaulted a Toronto

6    resident who was also then a friend of Chahal's, resulting in the man's blinding in one eye. Khraibut

7    believes he was shown this video by Chahal to warn him about the consequences of running afoul of

8    Chahal. These latent threats later were made more explicit.

9          159.    Chahal would also boast to his employees, including Khraibut, about his political

10   "connections," conveying the message that he could buy his way out of anything, thanks to his

11   political connections, as in the case of the powerful politician and venture capitalist/politician who

12   helped him minimize his domestic violence conviction.

13         160.    Chahal frequently subjected his business associates to his extreme mood swings,

14   which were possibly caused or influenced by his drug use. For example, during a Skype exchange on

15   August 11, 2014, Chahal reached out to Khraibut in a depressed mood, starting his discussion by

16   writing, "Fuck. This is depressing. Can't believe that whore [referring to his first domestic violence

17   victim] and RadiumOne all did this to me. Even Xanax isn't working anymore."

18         161.    Chahal went on to describe "pills and alcohol" that got him into his mental state, and

19   mused "I think I need to go back to rehab."

20         162.    Khraibut offered to come keep Chahal company that day, out of concern for his safety,

21   but Chahal stated he preferred to be alone.

22         163.    Chahal then made reference to "whipping out the 14 incher," a common reference that

23   he made among male colleagues about his genitalia. Chahal would frequently refer to "whipping out

24   the 14 incher" – his penis – and "putting it on the table." At times he referred to his "14 incher" as

25   "catorce," (Spanish for the number fourteen) and made such references both in the office and during

26   enforced "partying" with male employees, including Khraibut.

27         164.    On numerous occasions, Khraibut expressed his concern about Chahal's excessive

28   drug and alcohol use to Chahal, even suggesting that Chahal go to rehab and let other executives run



Complaint                           Case No.

1    Gravity4 while he got well, but Chahal reacted negatively to Khraibut's safety concerns about his

2    substance abuse.

3        165.    Chahal made clear to his male employees that he viewed women as inferior tools, in

4    both personal and business settings. He recounted to Khraibut one incident during which Chahal and

5    Grigorovici were in Las Vegas, meeting with an NFL marketing/development firm executive. Chahal

6    bragged that they arranged for the married man to receive oral sex from a woman they knew as an

7    inducement to getting him to sign on as a Gravity4 customer. Alaisa later added that the woman was

8    a prostitute. Khraibut felt very uncomfortable to learn that sexual inducements of this nature were

9    being used by Chahal to obtain business for Gravity4.

10       166.    Chahal frequently referred to women as "bitches" and "hoes" in text messages to his

11   male colleagues, including Grigorovici and Khraibut. On other occasions, Chahal amplified his

12   derogatory language regarding women, not only calling them "bitches" and "hoes," but using racist

13   terms such as "noodle house" to refer to an Asian romantic partner. In the same conversation, he

14   referred to himself as "the Indian Brad Pitt" telling Khraibut and others that for the "bitches" he was

15   about to proposition in Las Vegas, "Xmas" had come early for them.

16       167.    One on occasion, while Chahal, Khraibut, Alaisa, and Grigorovici were at a nightclub,

17   Chahal instructed Alaisa to "grab anyone above a 7," referring to female strangers in the club. He

18   then told him in the group text to "at least get some paper bags we can put on these bitches." He was

19   apparently displeased that the "bitches" he had encountered were "so fat. . . they [were] motivating

20   [him] to eat a gallon of Haagen Daas" [sic].

21       168.    That same night, Chahal, apparently displeased with the African-American host of the

22   nightclub, referred to him as a "retard" and told Alaisa and others to tell the host that he should "go

23   back to KFC." Alaisa responded that he would "punch [the host] in his cunt."

24       169.    Chahal frequently demanded that his male employees come to his condominium to

25   "hang out" and "party" with him, as a condition of continued employment. Khraibut was among the

26   core group of employees expected to pay court at to such gatherings, which typically included young

27   females, alcohol, and pills – prescription and otherwise.

28       170.    Although Khraibut does not consume alcohol or drugs, he felt pressured to attend

these events because they were organized by his employer, who lived upstairs in his building and who was paying Khraibut's rent. Moreover, Khraibut was often asked to do tasks for Chahal during these evenings, as part of his employment with Gravity4.

171.    Chahal ridiculed Khraibut's refusal to consume alcohol, telling Khraibut that he would not be able to go far in business unless he started drinking heavily like Chahal.

172.    Every time Khraibut would refuse to be part of Chahal's "posse" and keep women company around Chahal, Khraibut would suffer the brunt of Chahal's abuse in and outside the office during days following.

173.    Chahal sometimes impersonated Khraibut against his will by Skyping and calling companies as Khraibut, to make potential acquisitions and partners feel as if it were "hard to reach" Chahal, and that one had to "climb up the chain of command and make your way up to [Chahal]." Khraibut objected to Chahal's impersonation of him in this manner.

### Chahal's Pattern of Humiliating and Abusing Khraibut

174.    It was made clear to all senior executives that if they wanted to succeed at Gravity4 – or, more basic, even keep their jobs – they would need to satisfy Chahal's every whim, including middle-of-the-night demands to work on a project, to come to his condominium, to take over another person's work, to laugh at Chahal's crass jokes, to indulge Chahal's outsized ego, to keep up with Chahal in "partying," to procure "hot" women to socialize with Chahal, and even to cover up for Chahal's malfeasances with respect to women or to abusive conduct towards his employees, male and female.

175.    Chahal's motivational rhetoric often verged into casually and intentionally demeaning, bullying and humiliating his subordinates. Chahal's employees were expected to put up with this incessant emotional, verbal and even physical abuse as a condition of employment.

176.    Eventually, Khraibut became the object of Chahal's ridicule. Chahal frequently humiliated Khraibut in front of other employees by referring to Khraibut's bodily hair, saying that "in this part of the world" i.e. in the United States, men did not have chest hair. Chahal specifically mentioned Khraibut's Middle Eastern background when making these remarks, stating that "only Arabs" maintained chest hair.



Complaint

Case No.

177.    At times when ridiculing Khraibut's chest hair, Chahal would lift up Khraibut's shirt and slap Khraibut's stomach, without Khraibut's permission or invitation, and much to Khraibut's embarrassment. These incidents of unwanted touching occurred in front of other male employees at Chahal's residence, and were deeply humiliating to Khraibut.

178.    Chahal specifically shamed Khraibut regarding his religion, Islam, making frequent derogatory remarks about Allah, the Muslim deity.

179.    Chahal frequently referred to Khraibut as a "terrorist," due to his Middle Eastern background, repeating this slur in front of other employees.

180.    Chahal also would make jokes about bomb threats and terrorist groups such as ISIS directed at Khraibut, for the same purpose of humiliating him and ridiculing his background in front of others.

181.    Chahal frequently made fun of Khraibut's young age (19 years old during the employment period), and called him a "pussy" because Khraibut refused to indulge in the same drugs, alcohol, and partying lifestyle that Chahal did and that Chahal pressed upon his male cohorts. .

182.    In addition to ridiculing Khraibut for his religion, ethnicity, national origin, and age in front of Khraibut and others, Chahal routinely ridiculed the characteristics of other associates and even family members, usually outside their presence, creating fear in all of Chahal's employees that they, too, were similarly being derided as inferior and useless, often based on their protected characteristics. Thus, for example:

        a.    Chahal complained that Jews ran Silicon Valley and had conspired against him in business, and that if his last name had been "Zuckerberg," his former RadiumOne investors would have supported him;

        b.    Frequently referred to women as "pussy," "vagina," and "bitches," and commented on their appearances;

        c.    Referred to a new, gay hire that Khraibut had hired, as "a tranny" based on the employee's gender response on a Trinet HR survey, including ordering Khraibut to "look into his sexual orientation" because "hiring a tranny" would "make the Gravity4 look bad;"



Complaint

Case No.

d.   Ridiculed Indian supporters who send him fan mail or flocked to his defense after his first domestic violence arrest, as "groupies;"

e.   Referred to African-Americans as "niggers," "12 years a slave," "django," but also used the slur against those who had displeased him generally, including a white former digital advertising executive, and even Chahal's small dog, Gabroo, when the dog did something that angered Chahal (the latter in an incident that Alaisa, the bodyguard, caught on iPhone video for the purpose of later showing Chahal how he misbehaved while intoxicated);

f.   Ridiculed and said he did not want to hire Hindus (though making an exception for Nikhil Sharma, after instilling in Sharma's mind that Maharishi, the school Sharma wanted to attend, was full of "bullshit Hindu practices").

g.   Ridiculed his immediate relatives as "ungrateful pieces of shit," and that they betrayed him, even after Chahal "made them all millionaires," because the relatives refused to support Chahal's decision to publicly trash his former girlfriend and domestic violence victim, and because the relatives took issue with Chahal's bringing disrepute onto the family within the conservative Sikh community.

**Chahal Attempts to Involve Khraibut in a Second Domestic Violence Incident**

183.   During the summer and early fall of 2014, Chahal was dating and spending a significant amount of time with a Korean woman, nicknamed "Laura," whom Chahal met on one of his frequent visits to Las Vegas.

184.   Because Khraibut spent a significant amount of time after hours running errands for Chahal and in his condominium, Khraibut had multiple occasions to meet and interact with Laura, who moved to San Francisco and maintained an apartment near Chahal's residence.

185.   On several occasions, Chahal informed Khraibut that Laura, who was married at the time of the relationship, was in a "sham" "green card" marriage with a U.S. citizen, and was committing immigration fraud.

186.   Chahal and Laura had a stormy relationship. On several occasions in Khraibut's



Complaint                                                                                    Case No.

1   presence, Chahal threatened to file a complaint with the U.S. immigration authorities and get Laura

2   deported if she ever crossed him or reported him to any authorities.

3       187.    Chahal also threatened Laura by stating that Chahal had seen wire transfers from

4   Laura's affluent father in Korea to Laura's husband, ostensibly compensation for the "green card"

5   relationship.

6       188.    On the early morning of September 17, Chahal had an altercation with Laura in his

7   bedroom, as she later reported to the police.

8       189.    Laura called the police from Chahal's apartment during the incident.

9       190.    Chahal, meanwhile, called Khraibut to come up to the apartment after the incident.

10      191.    Chahal instructed Khraibut to tell the police that Khraibut had been in the

11  condominium during the alleged incident, and corroborate Chahal's story that Chahal's unlicensed

12  bodyguard, Alaisa, had also been present and awake and had escorted Laura from Chahal's bedroom

13  after a dispute about condoms.

14      192.    Khraibut was unwilling to state to authorities that he had been in the apartment at a

15  time that he had not been.

16      193.    Upon information and belief, Chahal was enraged that Khraibut refused to buttress

17  Chahal's alibi against Laura's assault charges.

18      194.    As a result of Chahal's conduct and pressuring Khraibut falsely to corroborate to the

19  police a scenario to which Khraibut had not actually been a witness – namely, Alaisa's involvement

20  in the altercation between Laura and Chahal, which Khraibut refused to corroborate – Khraibut began

21  to suspect that Chahal had been telling him lies all along about the first domestic violence incident,

22  and probably was lying about his behavior toward Laura as well.

23          **Chahal's Partying Leads to Threats of Violence and Termination Against Khraibut**

24      195.    Another incident occurred in Chahal's condominium on the evening of September 21,

25  2014, after Chahal and his groupies, but not Khraibut, had been out at a festival.

26      196.    That evening around 9:30 P.M., Chahal summoned Khraibut to Chahal's

27  condominium upstairs even though Khraibut was very tired from long hours of work.

28      197.    Khraibut was frequently summoned against his will and ordered to be one of Chahal's

Complaint                                                                                   Case No.

cohort of "wing men" to help chat up women and help Chahal and his close friends get the attention of the women. Khraibut objected to this practice, but was then retaliated against for refusing to go along, as he had done earlier that evening by refusing to go with others and Chahal to the festival.

198. Grigorovici was under the influence of the party drug MDMA during the incident, while Chahal was also high on an unknown drug, possibly MDMA or prescription drugs.

199. Later in the evening, Khraibut wandered into a guest room where Grigorovici was trying to "hook up" with a guest. Khraibut made a joke about the incident, and was asked to leave the room, which he did. As Khraibut was leaving, Alaisa shoved him.

200. Khraibut then left the condominium and returned to his apartment, downstairs.

201. At around 3 a.m. on September 22, Chahal made a Skype call to Khraibut, ordering him to apologize to Grigorovici and Alaisa. Chahal added in the Skype call that he would "beat the shit out of" Khraibut and break his teeth, or words to similar effect, and that he would send Khraibut back to Canada "tonight," among many other threats and ethnic slurs.

202. At around 4:14 a.m. on September 22, Chahal texted Khraibut "Did other girl leave my room?" Khraibut did not respond.

203. At around 6:24 a.m. that morning, Chahal texted again: "You got 2 more minutes to get your sorry ass up to my place and apologize to Kapp [nickname for Alaisa]. Before I book your ass to Toronto now. And I am not joking."

204. Khraibut responded that he was on the phone with Dan [Grigorovici]. Chahal persisted, stating "Your time is running out with me. 2 fucking minutes get your sorry ass up here." Khraibut repeated that he was talking to Grigorovici.

205. Chahal responded, "you can finish with Dan with your ass is up here."

206. A few minutes after 6:30 a.m. on September 22, 2014, Khraibut complied with Chahal's order and went to Chahal's condominium, upstairs.

207. The door was answered by Nikhil Sharma, who then absented himself and went to another room, leaving Khraibut at the table with Chahal and Alaisa.

208. Chahal called Grigorovici and put him on speaker phone.

209. Grigorovici, with whom Khraibut had just had a pleasant conversation, began



Complaint                                                                                                Case No.

swearing at Khraibut, while Chahal kept threatening to send Khraibut back to Canada, threatened to beat Khraibut and break his teeth, and stated that he would have Alaisa "take the fall" for Chahal because Chahal was still on probation from the first domestic violence incident and could not risk being arrested, despite his desire to "beat the shit" out of Khraibut.

210.   After such threats from Chahal were repeated numerous times in the hearing of Grigorovici and the present of Alaisa, Khraibut, fearing for his safety and determined to keep a personal distance from Chahal, returned to his apartment downstairs.

211.   On subsequent days, both Alaisa and Grigorovici attempted to downplay Chahal's threats of violence and threats of deportation. Grigorovici stated that Khraibut was overly sensitive and this was compounded by Khraibut's refusal to drink or do drugs with the others.

212.   Khraibut kept a strict personal distance from Chahal after the September 21/22 incident, fearing for his safety and not wishing to be subjected to further verbal and threatened physical abuse.

213.   Throughout the balance of the week of September 21 after Chahal's abusive outbursts and threats against Khraibut, Chahal for the first time began finding fault, repeatedly and openly, with Khraibut's work performance, picking faults with all of his work product and berating him in emails to other team members and outside consultants.

214.   During this period soon after Khraibut refused to lie to the police on Chahal's behalf, refused to "party" with drug-intoxicated colleagues, and refused to endure further threats of extreme violence, Chahal repeatedly threatened to fire Khraibut for performance reasons. For example, during an extended exchange on September 28, 2014 over Skype, Chahal brutally criticized Khraibut for alleged performance issues that had never previously been raised. This was a common feature of Chahal's management style – in the days or weeks before firing an employee, he would begin to publicly and privately berate them in an escalating crescendo of malice. Excerpts from this tirade include Chahal stating to Khraibut: "your [sic] a fucking moron/either get with the program/or get the fuck out."

215.   During this particular exchange, Chahal introduced the concept of potentially firing Khraibut, and specifically stated, "if I do end up firing your ass/you try to steal any IP/I will hunt you

Complaint                                                                                                    Case No.

down." Khraibut had not taken any intellectual property belonging to Chahal or Gravity4.

216.    Chahal's threats to "hunt down" Khraibut in relation to intellectual property were understood by Khraibut to be threats that if Khraibut ever revealed to others that Gravity4's DMP software had been taken by Grigorovici from prior employers, Chahal would have Khraibut physically assaulted or "taken out."

217.    Chahal subsequently stated to others that Khraibut was a "hacker," falsely implying and/or stating that he had gained access to information at Gravity4 that he was not entitled to have as part of his job or his role as part of Chahal's entourage.

218.    Chahal's escalating diatribes against Khraibut were a dramatic change from his prior acknowledgment of Khraibut's outstanding work performance. Chahal had frequently witnessed Khraibut designing interfaces himself late into the night at Chahal's residence and the office, and frequently described Khraibut to almost every hire as a "genius," "Jony Ive," "perfectionist," etc.

219.    In the wake of Chahal's tirades and threats during this Skype exchange, Khraibut attempted to placate Chahal and to save face for Chahal by accepting responsibility for an alleged time delay/design difference of opinion regarding the company website. Khraibut was only responsible for directly designing interfaces for about two weeks, until his responsibilities shifted towards hiring and overseeing employees who would execute Khraibut's vision, and he held a supervisory position for the majority of his tenure at Gravity4. Khraibut's job as head of design did not involve performing the actual labor to complete the website, but rather to manage in-house employees and a firm of Polish designers to execute Khraibut's vision as ordered by Chahal due to an early Gravity4 acquisition. Even though Khraibut was not responsible for the labor to complete the website, but Chahal berated him as if he were directly responsible for programming.

220.    At this time, with Chahal's frequent mentions of firing and forcing Khraibut to "get the fuck out," Khraibut was concerned that he would never be paid at all for his work on Gravity4, including his promised 1% stock options.

**Chahal Fires Khraibut As Retaliation for Complaints, Refusal to Commit Illegal Acts**

221.    In response to Chahal's incessant, abusive threats to fire Khraibut and "send him back to Toronto," Khraibut followed up on prior requests for his four months of back wages during the

1   month of September, 2014.

2       222.    Since Khraibut had joined Gravity4 in late June, 2014, Chahal had refused to pay his

3   salary or benefits, or to provide the stock option documentation that was routinely provided to other

4   company employees, for the one percent of stock options that had been promised to Khraibut.

5       223.    On September 29, 2014, Khraibut texted Chahal, "bro, I need my wages paid. it's

6   been almost 4 months and I haven't received anything. I have expenses and dental to pay for

7   tomorrow from SF, and I can't wait any longer."

8       224.    Chahal responded that he was busy in meetings and could not respond.

9       225.    The following day, September 30, Khraibut texted Chahal "g any update on pay and

10  wire?" (referring to a requested wire transfer from Michelle Louangamath, Chahal's assistant).

11  Chahal was with Grigorovici in New York at the time.

12      226.    Chahal responded to the effect that he was busy, would be deducting rent from any

13  payments, and that Khraibut should speak with Grigorovici.

14      227.    Khraibut and Chahal proceeded to argue over text message about the overdue wages

15  and alleged rent deductions, with Chahal claiming that Khraibut was "bitching for every dollar" and

16  Khraibut demanding his wages for work performed according to contract. Chahal's responses

17  included, "Leave me the fuck alone and do your God damn employee [sic]… Okay fuck off."

18      228.    Chahal at around 3:21 PM told Khraibut to send his wire info (which Khraibut had

19  already sent the prior day), adding "Pack your stuff. Your [sic] leaving tonight. You've officially

20  been terminated."

21      229.    Chahal called Khraibut from Grigorovici's phone, threatening and berating Khraibut,

22  with threats including threats to knock Khraibut's teeth out, stick a knife between Khraibut's teeth,

23  and "find [Khraibut] wherever you are and send someone to beat the shit out of you and have you

24  taken care of."

25      230.    Khraibut hung up while Chahal was delivering his diatribe. Chahal called again, and

26  Khraibut hung up before speaking.

27      231.    Alaisa then called Khraibut around 1:15 P.M. to inform Khraibut that Chahal would

28  be sending him the wire transfer and that a private investigator named "Marcel Myers" would take



1    Khraibut to the airport to fly back to Canada.

2        232.    Chahal also followed up that evening with the announcement by text to Khraibut that
3    a "Marcel Myers" would be coming to Khraibut's apartment to "pack your stuff and take you to
4    airport."

5        233.    Khraibut responded that given Chahal's multiple violent threats, Khraibut was not
6    going to get into a car with anyone, and would leave only once his wages were paid. Under extreme
7    duress at this time and concerned for his safety, Khraibut focused on the unpaid wages and his being
8    left with no place to stay, deciding to leave the issue of the unissued one percent of the company's
9    stock in options promised to him, for a later date. Moreover, Chahal had taunted Khraibut throughout
10   his employment with Gravity4 that Chahal held control over Khraibut's ability to stay in the country
11   due to controlling his work visa application, and that Khraibut could be expelled upon Chahal's
12   whim at any time. Khraibut was not in a position to resolve all of his compensation issues with
13   Chahal during this crucible of argument.

14       234.    Minutes later, Chahal emailed Khraibut's landlord, informing her that Khraibut had
15   been terminated and would no longer be using the apartment. He added, "Yousef, will be packing
16   today and leaving shortly back to Canada. I will let you know if and when a new employee of ours
17   will be occupying the space."

18       235.    Meanwhile, Chahal, in concert with Alaisa and a private investigator, began
19   threatening the building staff at Khraibut's building, demanding key access to Khraibut's apartment.

20       236.    Chahal followed up on these demands with threats of violence to the building's
21   general manager, at one point threatening to kill the man if he did not comply with Chahal's
22   demands.

23       237.    Upon learning about Chahal's threats of violence against the building manager,
24   Khraibut texted his landlord at 4:13 PM, stating, "they have been threatening me and my life is in
25   danger. You cannot grant key track [access] to anybody of them."

26       238.    For several hours, a private investigator retained by Chahal attempted to gain access to
27   Khraibut's apartment.

28       239.    Khraibut handed over company hard drives to the private investigator upon demand,



Complaint                                                                                    Case No.

and eventually turned the keys of the apartment over to the private investigator in exchange for money for a hotel room. During this exchange, Khraibut heard Chahal telling the private investigator that Khraibut had thrown a post-it note with Chahal's credit card number on it in the trash, falsely implying that somehow it was improper for Khraibut to have had the credit card number, or that Khraibut had somehow used the credit card without Chahal's express permission.

240. Khraibut left the country and returned to Canada shortly after this tense and threat-filled standoff, in fear of his life due to the dozens of threats of extreme and graphic threats of violence made by Chahal against him.

241. Days later, still in fear of his life after Chahal's incessant, violent threats, Khraibut left Canada and went into hiding for months.

242. In or around October 6, 2014, the San Francisco Police Department obtained a criminal protective order for Khraibut against Chahal, on the basis of Chahal's multiple threats of violence.

243. After Chahal hounded Khraibut out of the country, Khraibut was contacted by Laura, who reported that she had been contacted by the immigration authorities for questioning, presumably because Chahal had followed through on his threats to report her for alleged immigration violations.

### Chahal Defames, Harasses, Stalks and Interferes with Khraibut

244. Following Khraibut's abrupt termination from Gravity4, Chahal undertook a vicious campaign to defame him.

245. Among other things, upon information and belief, Chahal falsely accused Khraibut of stealing intellectual property belonging to Gravity4, called him a "hacker," and said that Khraibut had run up unauthorized charges on Chahal's credit card.

246. Chahal's falsehoods about Khraibut were published to various Gravity4 employees and Chahal associates.

247. Upon information and belief, on the day that Chahal was served with Khraibut's criminal protective order by the San Francisco Sheriff's department, Chahal entered Gravity4's offices and engaged in tirades against Khraibut, making threats of violent actions against him in the presence of several Gravity4 employees.



Complaint

Case No.

248. Chahal's threats included the threat that Chahal would "track [Khraibut] down wherever he is" and subject him to violence.

249. Chahal specifically mentioned to listening Gravity4 employees about "knowing people" in Eastern Europe who could "take care of" Khraibut.

250. Chahal's threats instilled fear into the minds of remaining Gravity4 employees who witnessed this and similar tirades.

251. Many of these employees, like most of Chahal's associates through the history of Gravity4 to date, were soon fired.

252. Although the criminal protective order issued on October 6, 2014 required Chahal to refrain from contacting Khraibut, Chahal caused his associates to contact Khraibut and/or interfere with his business on several occasions in 2014.

253. On or about early December 2014, while visiting relatives abroad, Khraibut received a suspicious telephone call from Sharma posing with a fake British accent and asking questions about Khraibut's whereabouts.  Sharma was pretending to be with Time Magazine.

254. Using a reverse lookup directory, Khraibut traced the suspicious call to Gravity4's San Francisco offices, and to a website operated by Sharma.

255. Sharma does not speak with a British accent normally, but does habitually perform Chahal's bidding.

256. Khraibut also was the victim of Facebook and email hacking the same week.

257. Khraibut, who used his personal computer while employed at Gravity4, has reason to believe that Chahal had keystroke tracking software installed on it during a time when Khraibut was deliberately distracted with another task, as Khraibut is aware of Chahal demanding similar, surreptitious software installations, on the personal computers of other associates of Chahal's.

258. On or about December 4, 2014, upon information and belief, Chahal caused Grigorovici to make a false police report to the San Francisco Police Department, falsely alleging that Khraibut had "stolen" Gravity4 "intellectual property," namely an iPhone.

259. The only iPhone ever given by Chahal or Gravity4 to Khraibut was a used, older iPhone 5 that Chahal had told Khraibut was the property of RadiumOne and that had been used by

Chahal's former RadiumOne assistant. In other words, if anything, this old phone was an item Chahal recycled from RadiumOne, his prior employer, and which did not belong to either Chahal or Gravity4.

260.    During the afternoon and evening of his abrupt termination on September 30, 2014, Khraibut turned over to Chahal's private investigator every item that the private investigator requested – namely, computer hard drives and apartment keys. At no time from the date of his termination through the present did Gravity4 ever ask Khraibut to return any item belonging to Gravity4, that Khraibut refused to return.

261.    Chahal is aware that other than text messages, the telephone in question would have contained no substantive content relevant to Gravity4.

262.    Chahal's causing Grigorovici to file a false police report regarding "intellectual property" in the form of an older, used iPhone belonging to Radium One, was part of Chahal's pattern of stalking, harassment, and interference with Khraibut's peaceful existence, and part of his campaign of instilling fear in Khraibut.

263.    After being fired and expelled from the country by Chahal, Khraibut attempted to start a media content analytics company called "Maison Matte," together with business contacts in New York. Maison Matte was an unlaunched website, which at all times conducted business in an industry (publishing media analytics) different from Gravity4 (advertising and mobile technology).

264.    Upon information and belief, Chahal had placed "alerts" on reverse-domain searches so that he could track any domains that Khraibut registered publicly in the future.

265.    Besides Nikhil Sharma's fraudulent, fishing December phone call with the fake British accent posing as a Time Magazine employee, who had been referred by an alleged Complex Magazine associate, Khraibut has been the subject of several other suspicious blocked, third party or indirect efforts, upon information and belief by Chahal and/or Sharma, to ascertain Khraibut's whereabouts and activities, all in violation of the restraining order. Maison Matte was unlaunched, maintained no clients, and was using various logos as a "filler" for the "Clients" section on the WordPress template that Maison Matte utilized. Because of this, at no time was it possible for the "Time Magazine employee" to be a real employee of Time Magazine, as the male caller who

Complaint

Case No.

1    indicated he was referred by a Complex Magazine associate asserted.

2         266.    In December, 2014, Khraibut was informed by his Maison Matte business associates

3    in New York that Chahal had telephoned them, attempting to find out whether Khraibut (who was

4    living overseas at the time) had started a new business renting space in their building. Upon

5    information and belief, Chahal "Googled" the filler address on the website, and then offered on the

6    spot to rent the entire building, apparently in an effort to thwart any employment or entrepreneurial

7    efforts by Khraibut, including Maison Matte.

8         267.    As a result of Chahal's interference with Khraibut's New York business contacts,

9    Khraibut has ceased working with them, and moved on to other projects not yet contaminated by

10   Chahal's malicious interference.

11        268.    Khraibut has lived in fear of his life for the months following his harrowing departure

12   from Gravity4, and the subsequent stalking by Chahal and his proxies, to the extent that he has even

13   taken weapons training in order to be able to protect himself.

14        269.    On September 14, 2015, Khraibut, through counsel, filed an earlier version of this

15   Complaint, alleging all of the same causes of action.

16        270.    In response to the filing, Chahal, Gravity4 and Sharma made various defamatory

17   public statements about Khraibut's counsel and Khraibut on September 14, and then insisted that

18   reporters print these comments as Gravity4's response to the lawsuit.

19        271.    In an email to the online publication *Business Insider*, Sharma accused Khraibut of the

20   crime of extortion (repeatedly), writing on September 14, 2015: "The entire case is baseless and false

21   and an act of extortion. This isn't the first time Yousef has extorted or Harmeet [Khraibut's counsel]

22   has crossed the civil extortion line, and from reading the suit today, everything is fabricated for quick

23   pay day."

24        272.    It is apparent from various letters from Chahal and Gravity4's counsel to Khraibut's

25   counsel in preceding weeks, that Sharma on his own behalf and on behalf of Gravity4 intended to and

26   did accuse Khraibut of *criminal*, in addition to civil, extortion in his public statements on September

27   14.

28        273.    From being a thriving, precocious young entrepreneur with numerous opportunities

Complaint                                                                                    Case No.

1    and a track record for producing millions of dollars in value in business, Khraibut's career has been

2    set back by years, and his peace of mind and reputation have been shattered, perhaps for years to

3    come.

4        274.    Khraibut has been forced to go into hiding from Chahal and his agents, take steps back

5    from his business efforts, and has now been forced to initiate this legal action, dredging up the events

6    of the past, in his final effort to obtain just recompense for the extreme and outrageous conduct to

7    which Chahal, Sharma, Gravity4, and their as yet unnamed agents, have subjected him.

8

9                            **FIRST CAUSE OF ACTION**
                    **Wrongful Termination in Violation of Public Policy**
10                                  **(Against Gravity4)**

11       275.    Khraibut repeats and incorporates each paragraph above as if fully set forth here.

12       276.    An employer-employee relationship existed between Khraibut and Gravity4,

13   respectively.

14       277.    Gravity4 terminated Khraibut on or about September 30, 2014.

15       278.    Gravity4's termination of Khraibut's employment was in direct violation of public

16   policy, including Khraibut's refusal to violate various California and/or federal laws, and his

17   complaints about Chahal's illegal practices, including, without limitation, the following:

18           a.   Penal Code Section 499(c), 15 U.S.C. Section 1125(a) *et seq.* – use of trade secrets

19               or intellectual property belonging to others;

20           b.   Penal Code Section 632 – eavesdropping on third parties without their consent as

21               ordered by Chahal;

22           c.   Penal Code Section 148.5 – making false statements to police investigating a

23               crime;

24           d.   Bus. & Prof. Code Section 25662 – minor in possession of alcohol; and

25           e.   8 U.S.C. Section 1342(a) – recruiting and hiring an alien to work in the United

26               States without work authorization.

27       279.    Khraibut had a good-faith belief that the actions in the preceding paragraph, which he

28   complained about in the context of his employment, were unlawful.



Complaint                                                                                    Case No.

280.    Khraibut's refusal to engage in unlawful acts at Chahal's direction, or to condone/participate in them, was a proximate cause of Khraibut's termination from Gravity4.

281.    Khraibut suffered damages as a result of having been terminated from Gravity4 in violation of public policy, including lost wages, lost opportunities, relocation expenses, and other damages, in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### Workplace Harassment in Violation of the Fair Employment and Housing Act Against Gravity4
### (Against Gravity4 and Chahal)

282.    Khraibut repeats and incorporates each paragraph above as if fully set forth here.

283.    Khraibut was subjected to unwanted and harassing conduct by Gravity4 and Chahal on the basis of his religion (Islam), his ethnicity (Arab), and his national origin (Kuwaiti).

284.    Gravity4's and Chahal's harassing conduct was so severe and pervasive that any reasonable Muslim Arab from a Middle-Eastern background in Khraibut's circumstances would have considered the work environment to be hostile and/or abusive to an intolerable degree.

285.    Khraibut did find the work environment to be hostile and abusive with regard to his religion, ethnicity, and national origin.

286.    Khraibut's direct supervisor, Chahal, personally engaged in the harassing conduct against Khraibut.

287.    Khraibut was proximately harmed by Gravity4's and Chahal's harassing conduct in an amount to be determined at trial.

288.    Gravity4's and Chahal's harassing conduct toward Khraibut was so extreme and outrageous as to warrant an award of punitive damages against them.

## THIRD CAUSE OF ACTION
### Workplace Discrimination
### (Against Gravity4)

289.    Khraibut repeats and incorporates each paragraph above as if fully set forth here.

290.    Khraibut's religion, ethnicity, and/or national origin were motivating factors in Gravity4's mistreatment of and ultimate termination of Chahal.



291.    Khraibut was proximately harmed by Gravity4's unlawful discrimination against him, and termination of him, on the basis of his religion, ethnicity, and/or national origin, in an amount to be determined at trial.

292.    Gravity4's harassing conduct toward Khraibut was so extreme and outrageous as to warrant an award of punitive damages against it.

### FOURTH CAUSE OF ACTION
### Failure to Prevent Harassment/Discrimination
### (Against Gravity4)

293.    Khraibut repeats and incorporates each paragraph above as if fully set forth here.

294.    At all times relevant hereto, Gravity4 was required, but failed, to take all reasonable steps to prevent discrimination and harassment under Government Code Section 12940(k), *et seq.*, as well as to prevent retaliation.

295.    Gravity4's utter failure to investigate Chahal's discriminatory, abusive, and harassing conduct toward Khraibut constituted a failure to prevent discrimination under the California Fair Employment and Housing Act.

296.    As a proximate result of Gravity4's failure to take all reasonable steps to prevent workplace harassment against Khraibut, Khraibut has suffered, and will continue to suffer, extreme mental anguish and emotional and physical distress and injury, humiliation, anxiety, lost earnings, other employment benefits, and job opportunities, causing damage in an amount to be determined at trial.

297.    Because Gravity4's failure to prevent harassment and discrimination against Khraibut was willful and deliberate, and because the harassment itself was deliberate and malicious on the part of Chahal, Khraibut's supervisor and the controlling owner of Gravity4, Khraibut is entitled to an award of exemplary damages in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION
### Breach of Contract – Equity Compensation
### Against Gravity4
### (Against Gravity4 and Chahal)

298.    Khraibut repeats and incorporates each paragraph above as if fully set forth here.

43

299.    A material part of the compensation offered to Khraibut by Chahal in order for Khraibut to join Gravity4, was founder's equity in Gravity4, which Chahal completely controlled.

300.    Chahal orally offered Khraibut 1% of the company's outstanding stock in the form of stock options priced at one cent each at the outset of Gravity4's founding, and vesting immediately. Chahal has publicly boasted that this stock, upon a near-term IPO, would be worth at least $30 million.

301.    Khraibut accepted Chahal's offer by coming to work for Gravity4, and a binding oral contract was formed.

302.    Khraibut followed up with Chahal repeatedly during the court of Khraibut's employment with Gravity4 about his stock option package, but Chahal persistently refused to give Khraibut the same stock option paperwork that was routinely provided to other new executive hires.

303.    Khraibut performed all of the conditions necessary under the contract – namely, he came to work at Gravity4, and he performed all of the duties assigned to him as required.

304.    Gravity4 failed to provide Khraibut with the promised stock options.

305.    Khraibut was harmed by Gravity4's failure to perform its side of the bargain, in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION
### Failure to Provide Accurate Wage Statements
### (Against Gravity4)

306.    Khraibut repeats and incorporates each paragraph above as if fully set forth here.

307.    California Labor Code section 226 provides that every employer is required, "semimonthly or at the time of each payment of wages," to provide each of his or her employees an itemized wage statement, including *inter alia*, the total hours worked by the employee (except for salaried employees), and "all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee."

308.    During the period that Khraibut was employed by Gravity4, it failed to provide Khraibut with full and accurate itemized wage statements as required by Labor Code section 226. Khraibut has suffered injury as a result of confusion and disarray at whether he has been paid for all

Complaint

Case No.

of his hours worked. This injury was caused by Defendants' knowing and intentional failure to issue any full and accurate itemized wage statements to Khraibut.

## SEVENTH CAUSE OF ACTION
### Violation of California Labor Code Section 970
### (Against Gravity4)

309.    Khraibut repeats and incorporates each paragraph above as if fully set forth here.

310.    Chahal and Grigorovici, on behalf of Gravity4, made false statements to Khraibut to induce him to leave his home in Ontario, Canada, and travel to San Francisco for the purpose of full-time employment with Gravity4.

311.    Gravity4 made false statements to Khraibut about the character of the work he was expected to do.

312.    Gravity4 made false statements to Khraibut about the duration of his employment, and the associated compensation, including promising him stock options that never materialized.

313.    Gravity4 made false statements to Khraibut regarding the housing conditions relating to or surrounding his work.

314.    Khraibut acted in justifiable reliance on Gravity4's false statements pertaining to his employment, including, *inter alia*, by moving from Ontario to San Francisco for the sole purpose of working for Gravity4.

315.    Gravity4 knew that the representations it made to Khraibut to induce him to move to San Francisco were false, and yet they made these misrepresentations to him for the express purpose of inducing him to relocate to San Francisco for employment with Gravity4.

316.    Gravity4's use of false representations about Khraibut's employment were a proximate cause of substantial damages to Khraibut, including, without limitation, moving expenses, lost income, lost opportunities, and other damages.

317.    Gravity4's conduct in causing Khraibut to move from his home to San Francisco for employment with Gravity4 was an intentional misrepresentation and/or concealment of material fact known to Gravity4, with the intention of depriving Khraibut of property or legal rights or otherwise causing him injury, and was despicable conduct in conscious disregard of Khraibut's rights, such that

an award of exemplary and punitive damages is justified in this matter, including, without limitation, double damages pursuant to Labor Code Section 972.

## EIGHTH CAUSE OF ACTION
### Retaliation For Reporting Unsafe Working Conditions – Labor Code Section 6310
### (Against Gravity4)

318. Khraibut repeats and incorporates each paragraph above as if fully set forth here.

319. Khraibut reported unsafe working conditions to Gravity4 – namely, Chahal's excessive drug and alcohol use which caused him to lash out at his associates, and Chahal's pressuring employees to take prescription drugs such as Adderall, for which the employees did not have prescriptions.

320. Khraibut competently performed all employment functions at Gravity4 assigned to him.

321. Khraibut was terminated from his employment in retaliation for reporting unsafe working conditions, and for refusing to condone or participate in the unsafe working conditions.

322. Khraibut has been damaged as a result of the retaliatory termination in an amount to be determined at trial, but including lost wages and benefits.

## NINTH CAUSE OF ACTION
### Intrusion Upon Seclusion
### (Against Gravity4,Chahal, and Does 1-10)

323. Khraibut repeats and incorporates each paragraph above as if fully set forth here.

324. Khraibut had a reasonable expectation of privacy in his personal computer that he brought to the workplace at Gravity4.

325. Upon information and belief, one or more employees of Gravity4, at the direction of Chahal, caused spyware to be installed upon Khraibut's personal computer, allowing Chahal access to Khraibut's private correspondence, passwords, and social media accounts.

326. As a proximate result of the placement of the spyware, Khraibut's social media accounts were hacked, causing a disruption in his communications.

327. The intrusion by Gravity4, Chahal and/or Does 1-10 upon Khraibut's privacy was highly offensive to Khraibut.



Complaint

Case No.

328.   The intrusion by Gravity4, Chahal and/or Does 1-10 upon Khraibut's privacy would have been offensive to a reasonable person.

329.   Khraibut was proximately harmed as a result of Defendants' intrusion upon his privacy, in an amount to be determined at trial.

330.   The conduct of Gravity4, Chahal, and/or Does 1-10 in intruding upon Khraibut's privacy was so extreme, outrageous, and offensive as to warrant an award of exemplary damages.

**TENTH CAUSE OF ACTION**
**Defamation *Per Se***
**(Against Chahal, Sharma, and Gravity4)**

331.   Khraibut repeats and incorporates each paragraph above as if fully set forth here.

332.   After firing Khraibut from Gravity4, Chahal made numerous false statements about Khraibut to business associates and employees, including the following:

   a.   That Khraibut had "stolen" Chahal's and/or Gravity4's intellectual property;

   b.   That Khraibut was a "hacker" against Gravity4 and/or Chahal;

   c.   That Khraibut had used Chahal's credit card to make unauthorized charges.

333.   Upon information and belief, Chahal's defamation included instructing employees of Gravity4 to search hard drives that had been in Khraibut's possession for business reasons but that Khraibut willingly turned over to Chahal's agent on the day that Khraibut was terminated, September 30, 2014.

334.   Upon information and belief, the instruction given to the employees was to find any evidence on the hard drives of intellectual property theft relating to Gravity4 or Chahal, by Khraibut, without any reasonable basis for any of them to believe that Khraibut had stolen anything.

335.   Upon information and belief, Chahal's defamatory statements about Khraibut were published to several individuals, including several Gravity4 employees (or employees at the time).

336.   Chahal's defamatory statements, as the CEO of Gravity4, are imputed to Gravity4 as they concerned, in part, Khraibut's role as a Gravity4 employee; they were made, in part, in the Gravity4 offices; and they were made to several Gravity4 employees.

337.   Chahal's defamatory statements about Khraibut are defamatory *per se* in that they accuse him of crimes – intellectual property theft and unauthorized credit card use – or they tend to



Complaint                                                                                          Case No.

1   injure Khraibut in his profession – i.e., imputing to him the unethical act of "hacking" against

2   Gravity4. These statements are not privileged.

3       338.    Chahal's statements had a tendency to, and in fact did, injure Khraibut's reputation in

4   his profession, including causing employees of Gravity4 to think poorly of Khraibut and to believe

5   the defamatory statements.

6       339.    Chahal made the false statements about Khraibut deliberately knowing their falsity, or

7   without regard to their truth or falsity.

8       340.    Sharma's statements on September 14, 2015 stating as fact that Khraibut had

9   committed extortion on multiple occasions, are false, malicious, and defamatory, and were

10  deliberately published to thousands of readers of *Business Insider*.

11      341.    Sharma's defamatory statements are imputed to Gravity4 and to Chahal as they were

12  made at least in part, upon information and belief, at Chahal's behest and on behalf of Gravity4.

13      342.    Sharma's defamatory statements about Khraibut are defamatory *per se* in that they

14  accuse him of crimes – repeated acts of extortion – with no factual basis whatsoever to believe that

15  Khraibut has committed the crime of extortion, or even the tort of extortion. These statements are not

16  privileged.

17      343.    Because Chahal's, Sharma's, and Gravity4's publication of the false and defamatory

18  statements about Khraibut were malicious, deliberate, and designed to harm Khraibut, Khraibut is

19  entitled to an award of exemplary damages in an amount to be determined at trial.

20

21                        **ELEVENTH CAUSE OF ACTION**

22              **Intentional Infliction of Emotional Distress**
                   **(Against Gravity4, Sharma, and Chahal)**

23      344.    Khraibut repeats and incorporates each paragraph above as if fully set forth here.

24      345.    Chahal repeatedly subjected Khraibut to extreme verbal and emotional abuse and

25  unwanted physical touching, both at the office and at other locations after hours, including at

26  Chahal's residence.

27      346.    After Chahal fired Khraibut, and after Khraibut obtained a restraining order against

28  Chahal, Chahal attempted in December, 2014 to interfere with Khraibut's business endeavors by

Complaint                                                                                    Case No.

**DILLON LAW GROUP INC.**

trying to get Khraibut's business associates in New York to dissociate themselves from Khraibut.

347.    Chahal's conduct, on his own behalf and on behalf of Gravity4, was outrageous.

348.    After Khraibut was fired by Gravity4 and stalked and harassed by Chahal, Sharma also participated in the stalking and harassment by placing harassing telephone calls impersonating a magazine writer in order to try to obtain information from Khraibut.

349.    Sharma's conduct, on his own behalf and on behalf of Gravity4, was outrageous.

350.    Chahal, Sharma, and Gravity4 acted with intent to cause Khraibut to suffer extreme emotional distress, or they acted with reckless disregard of whether Khraibut would suffer emotional distress.

351.    Khraibut suffered extreme emotional distress as a proximate result of Gravity4's, Sharma's, and Chahal's conduct described above, which distress is ongoing, causing damage to him in an amount to be determined at trial.

352.    Because Chahal's, Sharma's, and Gravity4's conduct was intentional and outrageous, including Chahal's threats of violence with weapons, Khraibut is entitled to an award of exemplary damages in an amount to be determined at trial.

### TWELFTH CAUSE OF ACTION
### Unfair Business Practices, Bus. & Prof. Code Section 17200 *et seq.*
### (Against Gravity4 and Chahal)

353.    Khraibut repeats and incorporates each paragraph above as if fully set forth here.

354.    Gravity4 violations of the Labor Code as described above, Gravity4 and Chahal's spying on employees, including Khraibut, Gravity4 and Chahal's inducing employees to join a company and accept stock options of a company founded on stolen intellectual property, and their failure to honor contractual obligations to provide promised stock options, all constitute unfair and unlawful business practices pursuant to Business & Professions Code Section 17200 *et seq.*

355.    The unlawful conduct described herein resulted in economic harm to Khraibut.

356.    As a direct and proximate result of their acts mentioned herein, Gravity4 and Chahal have received and continue to receive ill-gotten gains belonging to Khraibut.

357.    Khraibut is entitled to restitution for his losses in an amount to be determined.

358.    Because the conduct alleged herein is ongoing, and there is no indication that either



Complaint                                                                                          Case No.

1   Chahal or Gravity4 will cease their unlawful conduct described herein, Khraibut requests that this

2   Court enjoin them from further violations of California's employment, privacy, and discrimination

3   laws.

4                                **PRAYER FOR RELIEF**

5           WHEREFORE, Plaintiff Yousef Khraibut prays for relief and judgment against Defendants,

6   jointly and severally, as follows, in amounts according to proof:

7           1.      For judgment in favor of Plaintiff against Defendants;

8           2.      For general, special and compensatory damages;

9           3.      For disgorgement of profits ill-gotten;

10          4.      For punitive and exemplary damages;

11          5.      For pre-judgment interest;

12          6.      For attorneys' fees under applicable provisions of law, including several provisions of

13  the Fair Employment and Housing Act and the California Labor Code;

14          7.      For costs of suit incurred herein; and

15          8.      For such other and further relief as the Court deems just and proper.

16

17

18                              **DEMAND FOR JURY TRIAL**

19          Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands

20  trial by jury in this action of all issues so triable.

21

22  Date: September 28, 2015                    DHILLON LAW GROUP INC.

23

24                                              _/s/ Harmeet K. Dhillon_____

25                                              Harmeet K. Dhillon
                                                Krista L. Baughman
26                                              Attorneys for Plaintiff Yousef Khraibut

27

28



Complaint                                                                        Case No.